ATTORNEYS FOR APPELLANT

Todd A. Richardson
Matthew S. Tarkington
Lewis & Kappes
Indianapolis, Indiana

Rita J. Baldwin
Washington, Indiana

ATTORNEY FOR APPELLEE

Larry L. Eaton
Versailles, Indiana

# In the
# Indiana Supreme Court

No. 69S01-0308-CV-387

CLARENCE E. FRALEY,                                    *Appellant (Defendant below),*

v.

CLARENCE K. MINGER AND EVA MINGER,          *Appellees (Plaintiffs below).*

Appeal from the Ripley Circuit Court, No. 69C01-9610-CP-136
The Honorable Carl H. Taul, Presiding Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 69A01-0208-CV-315

**June 20, 2005**

Dickson, Justice.

In this quiet title action asserting adverse possession, the defendant Clarence E. Fraley appeals a judgment awarding fee simple title to approximately 2.5 acres of land to the adverse possessors, plaintiffs Clarence K. Minger and Eva Minger. The Court of Appeals reversed. Fraley v. Minger, 786 N.E.2d 288 (Ind. Ct. App. 2003). We granted transfer, 804 N.E.2d 748. Upon examination of the common law concept of adverse possession in Indiana, we rephrase its essential elements and find those elements established here. In addition, however, renewing our fifty-year-old construction of the adverse possession tax statute, we conclude that this statutory

additional adverse possession requirement is not satisfied in this case and reverse the judgment of the trial court.

This is an appeal from a bench trial final judgment following remand from the Court of Appeals, which in a memorandum decision had reversed the grant of summary judgment in favor of the Mingers. Fraley v. Minger, 69C01-9610-CP-136 (Ind. Ct. App. 2000). Upon remand, counsel for Fraley requested written findings of fact and conclusions of law, both parties submitted proposed findings and conclusions, and the trial court included findings of fact and conclusions of law with its judgment. Fraley does not challenge the trial court's findings of fact but argues that the facts explicitly found by the trial court and the uncontradicted trial evidence fail to establish adverse possession as a matter of law.

The dispute in this case involves a 2.5-acre tract of undeveloped rural land along the west side of and adjacent to a twenty-four-acre farm in rural Ripley County purchased by the Mingers from Raymond and Ada Chaney in 1955. At the time, the Chaneys denied owning the 2.5-acre tract and stated that they did not know who owned it. Trans. at 19-20. And Truman Belew, who in 1963 acquired the land that was eventually deeded to Fraley, told the Mingers that he did not own the tract. *Id.* at 35. The Mingers believed the tract was unclaimed. Truman died in 1994, and in 1996, this tract was included in land conveyed by deed to Fraley from Melvin Belew, Truman's son, as guardian of Luella Belew, Truman's widow. The trial court's judgment sets forth findings of fact and conclusions of law including in relevant part the following:

1. The Mingers acquired title to the land adjoining the disputed tract . . . on May 21, 1955.
2. The Mingers have paid taxes on the real estate adjacent to the disputed tract.
3. The disputed tract consists of approximately 2.5 acres . . .
4. [Fraley] received a deed to the disputed tract and other real estate . . . on February 28, 1996.
5. The Minger children and their friends played on the disputed tract from 1970.
6. Friends and neighbors thought the Mingers owned the disputed tract.
7. Neither the Mingers or their friends and neighbors ever saw the Belews [the titled owners at the time] on the disputed tract.
8. The Mingers moved to their farm adjacent to the disputed tract on June 17, 1955.
9. The Mingers knew when they purchased their farm that the disputed tract was not described in their deed.
10. The Mingers believed the disputed tract was unclaimed in 1955.
11. The Mingers took possession of the disputed tract:

2

a. One year after 1955, the Mingers regarded the disputed tract as theirs.
b. By 1972, the Mingers had built a fence along County Road 625 East to fence the disputed tract.
c. The Mingers pastured cattle on the disputed tract.
d. The Mingers used wood from the disputed tract from the 1980's to as late as 1993.
e. The Minger children camped and hunted on the disputed tract in the 1960s, 1970s, and 1980s.
f. The Mingers sold timber from the disputed tract.
g. Minger children and friends rode dirt bikes on the disputed tract.
h. The Mingers installed a culvert in the ditch from County Road 625 East on to the disputed tract and used it as access to the disputed tract.

12. No evidence was offered by [Fraley] to refute the testimony of the [Mingers'] witnesses that the Mingers exercised possession and control of the disputed tract for more than the statutory time required for them to obtain title.

13. The Mingers had the actual possession of the disputed tract from 1956 to the date of trial.

14. The Mingers had visible possession of the disputed tract from 1956 to the date of trial.

15. The Mingers had notorious possession of the disputed tract from 1956 to the date of trial.

16. The Mingers had the exclusive possession of the disputed tract from 1956 to the date of trial.

17. The Mingers claimed ownership hostile to [Fraley and his] predecessors in title for more than ten (10) continuous years prior to February 29, 1996.

CONCLUSIONS OF LAW

1. The continuous use of the disputed tract by the Mingers for more than a continuous period in excess of ten years to pasture their cattle, cut wood, sell timber, and recreational activities constitutes the visible and exclusive possession of the disputed tract.

2. The common perception for more than ten years of the friends and neighbors of the Mingers that the Mingers were the owners of the disputed tract constitutes notorious possession of the disputed tract.

3. The common perception of the friends and neighbors of the Mingers that the Mingers were the owners of the disputed tract constitutes a claim of ownership hostile to [Fraley and his] predecessors in title.

4. The construction of the fence should have alerted any reasonable title owner that his property is being adversely claimed.

5. Open and visible possession has been stated in general terms, th[u]s: it is necessary and sufficient if the nature and character is such as is calculated to apprise the world that the land is occupied and who the occupant is.

6. The Mingers exercised actual, visible, notorious and exclusive possession of the disputed tract of real estate under a claim of ownership hostile to [Fraley and his] predecessors in title for a continuous period of more than ten years prior to filing the law suit herein.

7. The Mingers had established that they were the owners of the disputed real estate

3

many years prior to February 29, 1996.

8. [Fraley] failed to oust the Mingers from the disputed tract before the Mingers had exercised actual, visible, notorious and exclusive possession of the disputed tract of real estate under a claim of ownership hostile to [Fraley and his] predecessors in title for a continuous period of more than ten years.

9. The statute of limitations was not stayed even if the Belews and others in title were unaware of their ownership.

10. The Mingers are entitled to a judgment on their complaint against [Fraley] and against [Fraley on his] counterclaim against the [Mingers].

Appellant's App'x. at 6-10.

In the appellate review of claims tried without a jury, the findings and judgment are not to be set aside unless clearly erroneous, and due regard is to be given to the trial court's ability to assess the credibility of the witnesses. Ind. Trial Rule 52(A). A judgment will be clearly erroneous when there is "no evidence supporting the findings or the findings fail to support the judgment," Chidester v. City of Hobart, 631 N.E.2d 908, 910 (Ind. 1994), and when the trial court applies the wrong legal standard to properly found facts, Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997). While findings of fact are reviewed under the clearly erroneous standard, appellate courts do not defer to conclusions of law, which are reviewed de novo. Fobar v. Vonderahe, 771 N.E.2d 57, 59 (Ind. 2002); Bader v. Johnson, 732 N.E.2d 1212, 1216 (Ind. 2000); Menard, Inc. v. Dage-MTI, Inc., 726 N.E.2d 1206, 1210 (Ind. 2000). Where cases present mixed issues of fact and law, we have described the review as applying an abuse of discretion standard. Forbar, 771 N.E.2d at 59 ("Although this is in some sense an issue of law, it is highly fact sensitive and is subject to an abuse of discretion standard."). In the event the trial court mischaracterizes findings as conclusions or vice versa, we look past these labels to the substance of the judgment. Beam v. Wausau Ins. Co., 765 N.E.2d 524, 528 (Ind. 2002); State v. Van Cleave, 674 N.E.2d 1293, 1296. "In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made." Yanoff, 688 N.E.2d at 1262.

Suggesting that a heightened degree of proof is needed to establish adverse possession, Fraley argues that such claims require proof by strict, clear, positive, and unequivocal evidence. This assertion finds support in some prior opinions. *See, e.g.*, Panhandle Eastern Pipe Line Company v. Tishner, 699 N.E.2d 731, 736 (Ind. Ct. App. 1998) ("Each of the elements of ad-

4

verse possession must be strictly proved by evidence that is clear, positive, and unequivocal."); <u>Piel v. Dewitt</u>, 170 Ind.App. 63, 73 n.10, 351 N.E.2d 48, 55 n.10 (1976) ("The burden of establishing title by adverse possession falls affirmatively upon the asserter who must adduce proof which is strict, clear, positive, and unequivocal."); <u>Milhon v. Brown</u>, 127 Ind.App. 694, 700, 143 N.E.2d 573, 576 (1957) (Adverse possession "must be strictly proved" and supported by "competent and substantial evidence."); <u>Coal Creek Coal Co. v. Chicago, T.H. & S.E. Ry. Co.</u>, 114 Ind.App. 627, 640, 53 N.E.2d 179, 184 (1944) ("The burden of overcoming the presumptions which exist in favor of the holder of the legal record title rests upon the one claiming title by adverse possession and the proof must be strict, clear, positive and unequivocal."); <u>Philbin v. Carr</u>, 75 Ind.App. 560, 582, 129 N.E. 19, 27 (1920) ("[P]roof of all the essential facts must be clear and unequivocal."). At least one commentator observes that "American state courts are in general agreement" that the elements of adverse possession must be established "by clear and convincing evidence." 16 POWELL ON REAL PROPERTY § 91.01[2] at 91-6, 91-7 (1999).[1] On the other hand, other relatively recent cases have omitted reference to any heightened standard of proof.[2] Deferring to the majority of cases that have actually discussed the quantum of proof issue, we find that the heightened standard is appropriate. Employing current terminology, however, we believe that "clear and convincing" is a preferable way to describe the heightened standard needed to establish adverse possession, thus embracing and superseding the variety of terms previously used.

Where overcoming a presumption requires a heightened quantum of proof, however, such

---

[1] Among the cases cited therein for this proposition, however, is <u>Carter v. Malone</u>, 545 N.E.2d 5 (Ind. Ct. App. 1989), which contains no mention of "clear and convincing evidence" or any other heightened standard of proof. Instead, it merely states:

> Record title is the highest evidence of ownership, and is not easily defeated and while title may be defeated by adverse possession, mere possession is the lowest evidence of ownership. In order for possession of real estate to ripen into title, it must be adverse, actual, open, notorious, exclusive, continuous and under a claim of right for the prescribed statutory period.

*Id.* at 6.

[2] *See, e.g.,* <u>Coffin v. Hollar</u>, 626 N.E.2d 586, 589 (Ind. Ct. App. 1993) ("To establish the claim, each element of adverse possession must be met before the possession may ripen into legal title against the holder of the record title."); <u>Roser v. Silvers</u>, 698 N.E.2d 860, 863 (Ind. Ct. App. 1998) ("Title to real estate may be defeated by adverse possession where the possession has been actual, visible, notorious, exclusive, under a claim of ownership hostile to the true owner, and continuous for a ten year period."); <u>Snowball Corp. v. Pope</u>, 580 N.E.2d 733, 734 (Ind. Ct. App. 1991) ("title to real estate may be defeated by adverse possession where the possession has been actual, visible, notorious, exclusive, under a claim of ownership, hostile to the true owner, and continuous for the statutory period.")

determination falls within the sound discretion of the fact-finder, whose discretion is afforded deferential review. *See* In re Guardianship of B.H., 770 N.E.2d 283, 287 (Ind. 2002). In reviewing a judgment requiring proof by clear and convincing evidence:

> an appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence.

*Id.* at 288. We will likewise apply this standard of appellate review in the instant case and determine whether a reasonable trier of fact could conclude from the facts found by the trial court that the challenged elements of adverse possession were established by clear and convincing evidence.

**Common Law Adverse Possession**

The common law doctrine and application of adverse possession has a long history. As early as 2250 B.C. the Code of Hammurabi discussed adverse possession and the misuse of land, including provisions that punished land waste, rewarded long-term development, and allowed one who worked the land of another for three years to take and keep the land. *See* Brian Gardiner, Note, Squatters' Rights and Adverse Possession, 8 Ind. Int'l & Comp. L. Rev. 119, 123 (1997) (hereafter "Gardiner"); John G. Sprankling, An Environmental Critique of Adverse Possession, 79 Cornell L. Rev. 816, 821 n.17 (1994) (hereafter "Critique"). In England, the history of adverse possession can be traced back to the Norman Conquest in 1066. *See* Gardiner at 125. The common law doctrine of adverse possession was applied to resolve land disputes between colonists in Virginia as early as 1646, where it was used "in an effort to help resolve the proverbial conflicts between speculators and squatters." Critique at 823 n.29. The first statutory recognition of adverse possession in the New World appeared in a 1715 statute of limitations in North Carolina. Jeffry M. Netter, et al., An Economic Analysis of Adverse Possession Statutes, 6 Int'l Rev. L. & Econ. 217, 219 (1986) (hereafter "Netter").

With the western migration of pioneers, the federal government initially prohibited settlement of the western lands unless purchased from the government, but that requirement was

gradually relaxed; anti-squatting prohibitions were abandoned, recognition of preemptive purchase rights were extended, and land was distributed to military veterans. *See* John G. Sprankling, The Antiwilderness Bias in American Property Law, 63 U. Chi. L. Rev. 519, 528-29 (1996). Eventually, with the 1852 passage of the Homestead Act, land was freely available to such settlers. *Id*. At the same time, whereas the courts had originally followed the English example of requiring that the adverse possesser engage in activities giving notice to an inspecting owner such as residence, cultivation, fencing, and other improvements, American courts began to focus upon acts by the adverse possessor in keeping with the nature and character of the land involved. *Id*. at 538-39. The policy behind favoring adverse possession was the same as that of land distribution: favoring the productive use of the land. *Id*. at 534-40; *see also* Netter at 219 (adverse possession rewards the use of land and punishes those who sit on their rights).

Claims of adverse possession were litigated in Indiana from the early years of statehood. In Doe v. West, 1 Blackf. 133, 135 (Ind. 1821), the Court observed that "[i]n England, and in some of our sister States, it has been decided that 20 years' peaceable possession gives a right which is sufficient to maintain ejectment." The common law doctrine of adverse possession received legislative approval in Indiana with the enactment of specific 20-year statutes of limitation in 1820 and again in 1823. *Id.* at 136 ed. n.1. In 1853, this Court stated that for a claim of title based in adverse possession to defeat a legal title to property, "strict proof must be made not only that the possession was, from its inception, under a public claim of title adverse to that of the real owner, but that both such claim and possession have been continuous and uninterrupted . . . through the full period of twenty years." Doe v. Brown, 4 Ind. 143, 145 (Ind. 1853). In 1951, the General Assembly demonstrated its continued approval of the doctrine by shortening the applicable statute of limitations from twenty years to ten years. *See* Acts of 1951, ch. 301, § 2; *see also* Phar-Crest Land Corp. v. Therber, 251 Ind. 674, 683-684, 244 N.E.2d 644, 649 (Ind. 1969) (Hunter, J., concurring); Berry v. Jean, 401 N.E.2d 102, 104-105 (Ind. Ct. App. 1980).

During the latter nineteenth century, many of the Indiana adverse possession cases began to articulate specific elements required to establish adverse possession. *See, e.g.*, Hargis v. Inhabitants of Congressional Township, 29 Ind. 70, 71 (Ind. 1867) (requiring the claimant be "in actual, open, notorious, and exclusive possession thereof, claiming to be the owner in fee."). A

relatively consistent list of similar elements of common law adverse possession developed and is found thereafter even in more recent cases. Citing Penn Central Transportation Co. v. Martin, 170 Ind.App. 519, 353 N.E.2d 474 (1976), the parties each assert that to establish title by adverse possession, the claimant has the burden of proving the possession was: (1) actual; (2) visible; (3) open and notorious; (4) exclusive; (5) under claim of ownership; (6) hostile; and (7) continuous for the statutory period. Brief of Appellant Fraley at 5, Brief of Appellees Minger at 4. *See also* Marengo Cave Co. v. Ross, 212 Ind. 624, 630 (Ind. 1937). Later cases from this Court have used a slightly different formulation that omits "visible" and "hostile" but adds "adverse," and substitutes "claim of right" for "claim of ownership." This Court's opinions in Beaver v. Vandall, 547 N.E.2d 802, 804 (Ind. 1989), and McCarty v. Sheets, 423 N.E.2d 297, 300 (Ind. 1981), state that adverse possession is established by "open, continuous, exclusive, adverse and notorious possession of property under a claim of right for the statutory period." As authority for this statement, McCarty cited Worthly v. Burbanks, 146 Ind. 534, 45 N.E. 779 (1897). But Worthly lists the "five indispensable elements" of adverse possession as "1, It must be *hostile and under a claim of right*; 2, it must be *actual*; 3, it must be *open and notorious*; 4, it must be *exclusive*; and 5, it must be *continuous*." 146 Ind. at 539, 45 N.E. at 781 (emphasis in original). Emphasizing that the nature and situation of the disputed land must be taken into consideration, Worthly cites the following as a generally accepted proposition:

> An entry upon land with the intention of asserting ownership to it, and continuing in the visible, exclusive possession under such claim, *exercising those acts of ownership usually practiced by owners of such land, and using if for the purposes to which it is adapted, without asking permission and in disregard of all other conflicting claims*, is sufficient to make the possession adverse.

146 Ind. at 543, 45 N.E. at 782 (quoting Collett v. Board, 119 Ind. 27, 34, 21 N.E. 329, 331 (1889) (emphasis added in Worthly)).


In addition to Worthly, many other early Indiana cases recognized that a person may claim adverse possession based solely upon entry and actual possession of land, without any initial claim of color of title. *See* Bell v. Longworth, 6 Ind. 273, 276-77 (1855); Vancleave v. Milliken, 13 Ind. 105 (1859); May v. Dobbins, 166 Ind. 331, 333-34, 77 N.E. 353, 354 (Ind. 1906); Martin, 170 Ind.App. at 524, 353 N.E.2d at 477; Swanson v. New York Central R.R. Co., 83 Ind.App. 580, 583, 149 N.E. 353, 354 (1925). It is not necessary that possession be under color

of title; what is required is claim of right. In <u>May v. Dobbins</u>, 166 Ind. at 333, 77 N.E. at 354, this Court rejected an instruction "which stated that if appellant took possession of the land without color of title, and knew or had reason to believe who the rightful owner was, his occupancy would not be such good-faith occupancy under claim of ownership as would confer title, however long continued." *Id*. The Court recognized that such an instruction "accords with good morals, but it is not sound in law." *Id*. "The acquisition of title by adverse possession is predicated upon the statute of limitations, and the running of the statute may be instituted without even color of title, and without reference to the good or bad faith of the adverse claim asserted by the occupant." *Id*.; *see also* <u>Moore v. Hinkle</u>, 50 N.E. 822, 824, 151 Ind. 343, 347-48 (1898). Where one enters the land with the intention of asserting ownership and possesses the land openly and exclusively, exercising the usual acts of ownership upon the land for the full time under the statute of limitations, title will pass to the possessor. <u>May</u>, 166 Ind. at 334, 77 N.E. at 354-55.[3] While cases listing the elements of adverse possession frequently recite that the adverse claimant must occupy the land under a claim of right, that claim of right can be established by entering upon and occupying land with the intent to hold the land as one's own. *See* <u>Martin</u>, 170 Ind.App. at 524, 353 N.E.2d at 477. The <u>Martin</u> court succinctly stated that a "claim of right may be inferred in favor of the party in possession" where the party uses the land "in the same manner that an owner ordinarily uses his land." *Id*. (citing <u>Swanson v. New York Central R.R. Co.</u>, 83 Ind.App. 580, 583, 149 N.E. 353, 354 (1925); and <u>Abel v. Love</u>, 81 Ind.App. 328, 337, 143 N.E. 515, 518 (1924).[4]

Synthesizing and rephrasing these varying expressions to reflect a simplified articulation of the common set of shared concerns and the essence of the common law doctrine, we hold that the doctrine of adverse possession entitles a person without title to obtain ownership to a parcel

---

[3] *See also* <u>Smith v. Ponsford</u>, 184 Ind. 53, 56 (Ind. 1915): "[U]se which was open and continuous with knowledge on the part of the owner of the land subjected thereto and his acquiescence therein is sufficient to constitute prima facie proof that the use was exercised under a claim of right and was adverse."

[4] We note, however, that <u>Estate of Mark</u>, 547 N.E.2d 796 (Ind. 1989), contains language that an adverse possessor's claim of ownership "must be based on some ground justifying that conclusion," *id.* at 800, and finding "no evidence demonstrating a basis for his claim of right or claim of ownership," *id.* at 801. We regard such language as *obiter dicta*, however, since that issue was not being presented and the basis of the opinion's holding was rather the failure of the evidence to establish that the claimant's possession was adverse, hostile, and exclusive.

of land upon clear and convincing proof of control, intent, notice, and duration, as follows:

(1) Control -- The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the former elements of "actual," and in some ways "exclusive," possession);

(2) Intent -- The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse");

(3) Notice -- The claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open,"  "notorious," and in some ways the "hostile," elements); and,

(4) Duration -- the claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

In the present case, Fraley does not challenge the basis of the Mingers' claim of ownership as lacking a sufficient basis.  As to the historical common law elements of adverse possession, Fraley claims, rather, that the facts found by the trial court and shown by uncontradicted evidence fail to establish the requisite hostility and continuity needed for adverse possession.  He argues that the Mingers acknowledged uncertainty about who held title to the property and did not dispute the superior rights of the legal owners.  Fraley contends that the Mingers neither communicated a claim of hostile ownership to the titled owners nor possessed the property adversely and to the exclusion of all others.  He urges that the Mingers' activities such as pasturing cattle, cutting wood, and engaging in recreational activities on the disputed tract were sporadic and periodic activities and thus insufficient to establish that the Mingers possessed the property adversely.  Fraley also argues that the Mingers' activities on the tract were insufficient to establish permanent continuous possession for the requisite ten-year period.

These claims essentially assert that the findings are insufficient to establish each of the requisite elements of control, intent, notice, and duration.

Fraley argues that the Mingers' possession was not hostile because Mrs. Minger "openly

10

acknowledged the superior rights of the record title holder by making an inquiry about buying the parcel." Opp. to Pet. for Transfer at 5. Between the time of the death of Truman Belew in 1994 and the deed conveying the disputed tract to Keith Fraley in 1996, Eva Minger inquired about the possible purchase of about half of the tract from Melvin Belew. Fraley's contention that this inquiry disproves the Mingers' adverse possession is erroneous because title by adverse possession passes to the claimant by law at the end of the possessory period. Kline v. Kramer, 179 Ind. App. 592, 597, 386 N.E.2d 982, 987 (Ind. Ct. App. 1979). Once title vests in a party at the conclusion of the ten-year possessory period, the title may not be lost, abandoned, or for-feited, even where the party pays rent to the titleholder (Riggs v. Riley, 113 Ind. 208, 15 N.E. 253 (1887)), agrees to a survey to attempt to find the true boundary line (Fatic v. Myer, 163 Ind. 401, 72 N.E. 142 (1904)), expresses satisfaction with a survey whose results are inconsistent with the property adversely possessed by him (Grim v. Johns, 61 Ind.App. 514, 112 N.E. 13 (1916)), or states that he does not claim the land and offers to buy it (Rennert v. Shirk, 163 Ind. 542, 72 N.E. 546 (1904)). *See also* Marathon Petroleum Co. v. Colonial Motel Properties, Inc., 550 N.E.2d 778, 783 (Ind. Ct. App. 1990); Kline, 179 Ind.App. at 597, 386 N.E.2d at 987. The ten-year possessory period required for the Mingers' adverse possession clearly expired long be-fore Mrs. Minger's purchase inquiry after 1994 (which may have merely been an effort to avoid litigation), and her inquiry would not undermine any ownership by adverse possession that the Mingers had gained years earlier.

Fraley also argues that periodic or sporadic acts of ownership are not sufficient to estab-lish adverse possession. While it is true that the land must be used continuously for adverse pos-session, the use required need only be in keeping with the ordinary uses of the land. In McCarty, 423 N.E.2d at 300, we held that "what constitutes possession of a 'wild' land may not constitute possession of a residential lot." In Snowball Corp. v. Pope, 580 N.E.2d 733, 736 (Ind. Ct. App. 1991), the adverse claimant did little more with the land in question than treat it as an extension of his yard, but because the land was essentially a swamp, that use was held to be consistent with its character and sufficiently continuous to establish adverse possession.

Fraley describes the disputed tract as "undeveloped land in a rural portion of Ripley County." Br. of Appellant at 3. At trial, he depicted the tract as "[r]ough, growed up, wooded

11

hillside" with "a lot of scrub and brush that would take a number of years to grow," and as "[r]ough ground" and "rough hillside." Trans. at 81, 82. The Mingers assert that the disputed tract "was a briar patch and grownup." Br. of Appellees at 2. There is no essential dispute between the parties as to the nature of the tract, and we conclude that the Mingers' use of the tract was consistent with its character throughout the possessory period.

Supporting its conclusions as to the element of control are the trial court findings that the Mingers took possession of the disputed undeveloped rural tract in 1956; fenced and pastured cattle upon it; used wood and sold timber from it; and camped, hunted, and rode dirt bikes on it. The intent element is also supported by findings that the Mingers believed the disputed tract was unclaimed when they acquired and began residing on the adjacent tract in 1955; that the Mingers used the tract as their own; that they claimed ownership hostile to Fraley's predecessors in title; and that the Mingers' friends and neighbors believed the Mingers owned the disputed tract. These findings, plus the fact that they installed a culvert in a ditch to enable their access to the tract, also provide support establishing the notice element. As to duration, the trial court found that the Mingers' actual, visible, notorious, exclusive, and hostile ownership of the disputed tract continued from 1956 to the date of trial in 2002, thus establishing control, intent, and notice during a continuous period exceeding the ten-year statute of limitations.

We hold that, considering the issues of law and the facts found by the trial court and the inferences reasonably drawn therefrom, a reasonable trier of fact could correctly conclude that the challenged common law elements of adverse possession were established by clear and convincing evidence.

**Statute Requiring Payment of Taxes**

In addition to challenging the elements of common law adverse possession, Fraley contends that the court erred in finding adverse possession despite absence of evidence that the Mingers complied with a statutory provision requiring payment of taxes during the period of adverse possession. The trial court found that the Mingers "have paid taxes on the real estate *adjacent* to the disputed tract," Appellant's App'x. at 6 (emphasis added), but made no findings re-

garding the payment of taxes on the disputed tract itself.

The Indiana adverse possession tax statute, enacted in 1927, followed "great agitation in the northern part of the state caused principally by 'squatters' who were obtaining original titles to land by adverse possession." James H. Neu, Adverse Possession in Indiana, 16 Notre Dame Lawyer 216, 219 (1941) (hereafter "Neu"). A number of large corporations, which owned huge tracts of land and paid property taxes on them, were losing their land to "squatters" who settled on the land for the required twenty years and claimed the land by adverse possession. *Id*. at 219-20. To prevent these losses, the General Assembly enacted a statute providing:

> Hereafter in any suit to establish title to lands or real estate no possession thereof shall be deemed adverse to the owner in such manner as to establish title or rights in and to such land or real estate unless such adverse possessor or claimant shall have paid and discharged all taxes and special assessments of every nature falling due on such land or real estate during the period he claims to have possessed the same adversely: *Provided, however*, That nothing in this act shall relieve any adverse possesser or claimant from proving all the elements of title by adverse possession now required by law.

Acts 1927, ch. 42, § 1, p. 119 (currently codified, with minor changes, at Ind. Code § 32-21-7-1).

Some legal commentators expected that the adverse possession tax statute would "blow[] the lid off the kettle" with regard to the doctrine of adverse possession. Neu at 219. In the first twenty-four years after the adverse possession tax statute was enacted, however, this Court neither cited nor relied upon the adverse possession tax statute in seven decisions involving adverse possession. *See* Hare v. Chisman, 230 Ind. 333, 340-41, 101 N.E.2d 268, 271 (Ind. 1951) (noting adverse claimant paid property taxes but finding evidence insufficient to establish adverse possession); Elkhart v. Christiana Hydraulics, Inc., 223 Ind. 242, 259, 59 N.E.2d 353, 359 (Ind. 1945) (referring to adverse possession only summarily); Draper v. Zebec, 219 Ind. 362, 372, 37 N.E.2d 952, 956 (Ind. 1941) (referring to adverse possession only summarily), *overruled on other grounds by* O'Donnell v. Krneta, 238 Ind. 582, 598, 154 N.E.2d 45, 52 (Ind. 1958); Ft. Wayne Smelting & Refining Works v. Ft. Wayne, 214 Ind. 454, 459, 464, 14 N.E.2d 556, 559, 560-61 (Ind. 1938) (summarizing findings that adverse claimant and predecessors paid property taxes but affirming judgment for adverse possession without mention of tax statute); Marengo Cave Co. v. Ross, 212 Ind. 624, 628, 10 N.E.2d 917, 919 (Ind. 1937) (noting adverse claimant

paid property taxes but finding evidence insufficient to establish adverse possession); Geiger v. Uhl, 204 Ind. 135, 180 N.E. 10 (Ind. 1932) (finding adverse possession established but without mention of tax statute among elements); Hitt v. Carr, 201 Ind. 17, 162 N.E. 409 (1928) (same). Between 1927 and 1955, we find four Court of Appeals decisions mentioning adverse possession and the payment of taxes, two noting that the period of adverse possession preceded the statute,[5] one affirming a judgment challenged on grounds unrelated to taxes,[6] and one reversing a judgment because the findings were insufficient to establish compliance with the adverse possession tax statute.[7]

In the first case in which the adverse possession tax statute was actually analyzed by this Court, Echterling v. Kalvaitis, 235 Ind. 141, 126 N.E.2d 573 (Ind. 1955), the statute was found not applicable. This decision undertook to "examine the language of the act and look to the intention of the Legislature," explaining:

> The 1927 act was enacted to halt the pernicious effect of squatters upon lands where title holders had paid taxes on lands owned by them, but where possession of parts of the land was usurped by squatters for long years without claim of title or payment of taxes. These squatters eventually claimed they became seized with title through adverse possession.

Id. at 145, 126 N.E.2d at 575. But the Court proceeded to construe the adverse possession tax statute as "supplemental" to the adverse possession statute of limitations "and not as superseding it." Id. at 146, 126 N.E.2d at 575. This construction of the statute was premised on the policy that the intended effect of the adverse possession statute of limitations was "not to punish one who neglects to assert his right, but to protect those who maintained the possession of the land for the time specified by the statute." Id. (quoting Craven v. Craven, 181 Ind. 553, 560, 103 N.E. 333, 105 N.E. 41 (1914)). The disputed tract in Echterling resulted from a barbed wire fence constructed ten feet west of and parallel to a section line and running for 1320 feet along one side of a quarter of a quarter of a section. Noting that "complete legal descriptions of real estate are not present on the tax duplicates issued by county or city treasurers" and that instead they are "usually sketchy and inaccurate," the Court concluded:

> [W]here continuous, open, and notorious adverse possession of real estate has been

---

[5] Norling v. Bailey, 121 Ind.App. 457, 459, 98 N.E.2d 513, 514 (1951); Cooper v. Tarpley, 112 Ind.App. 1, 11, 41 N.E.2d 640, 644 (1942).
[6] Davis v. Biddle, 89 Ind.App. 361, 166 N.E. 301 (1929).
[7] Sheets v. Stiefel, 117 Ind.App. 584, 589, 74 N.E.2d 921, 923 (1947).

established for twenty years to a contiguous and adjoining strip of land such as that here in question, and *where taxes have been paid* according to the tax duplicate, although said duplicate did not expressly include that strip, *adverse possession is established* to that strip *even though the taxes were not paid* by the adverse claimant.

235 Ind. at 146-47, 126 N.E.2d at 575 (emphasis added).  The Court illustrated its intention regarding application of the tax statute with the following:

An example might be where one has record title to Lot No. 1 and has erected a building on that lot, which, twenty years later, is found by some surveyor to be one foot over on an adjoining lot, No. 2—the fact that the owner of Lot No. 1 was assessed for improvements (the building) and real estate (Lot No. 1) would be sufficient to comply with the statute as to payment of taxes.

*Id.* at 147, 126 N.E.2d at 575-76.


Thus the Court essentially applied the statute to require the adverse claimant to *substantially* comply with the requirement for payment of taxes.  Although the opinion did not expressly mention that the claimant's failure to pay taxes on the claimed boundary strip was inadvertent and unintentional, we believe that this is the clear implication.


Echterling's construction of the adverse possession tax statute has never been overruled or reconsidered by this Court.  One case, Mark v. H.H. Smith Co., 547 N.E.2d 796 (Ind. 1989), recites that, in addition to the elements of common law adverse possession, "the adverse claimant must pay real estate taxes on the property for the statutory period." *Id.* at 799-800.  But Mark makes no mention of Echterling.  The dispositive issue in Mark was not whether the claimant paid taxes but rather that the claimant never changed his permissive occupancy to that of adverse or hostile possession. *Id.* at 801.


The interpretation of the adverse possession tax statute in Echterling has been frequently followed during the ensuing fifty years of decisions by the Court of Appeals. *See* Clark v. Aukerman, 654 N.E.2d 1183, 1187 (Ind. Ct. App. 1995); Greene v. Jones, 490 N.E.2d 776, 778 n.2 (Ind. Ct. App. 1986); Dowell v. Fleetwood, 420 N.E.2d 1356 (Ind. Ct. App. 1981); Colley v. Carpenter, 172 Ind.App. 638, 644, 362 N.E.2d 163, 167 (1977); Penn Cent. Transp. Co. v. Martin, 170 Ind.App. 519, 522, 353 N.E.2d 474, 477 (1976); Longabaugh v. Johnson, 163 Ind.App. 108, 112, 312 N.E.2d 865, 868 (1975); Nasser v. Stahl, 126 Ind.App. 709, 720, 134 N.E.2d 567,

572 (1956); Smith v. Brown, 126 Ind.App. 545, 556, 134 N.E.2d 823, 828 (1956).

During the past twenty years, however, several decisions of the Court of Appeals have construed the adverse possession tax statute as interpreted in Echterling by viewing its purpose to be that of providing notice to the legal owner and concluding that, where clear notice was otherwise provided, courts could disregard the statutory requirement for payment of taxes by the adverse claimant. In Kline v. Kramer, 179 Ind.App. 592, 600, 386 N.E.2d 982, 989 (1979), the court stated:

> Under the statute requiring the payment of taxes, the adverse claimant who had paid taxes for ten years would have good title against the recorded titleholder who took no action to oust the adverse claimant even though the recorded titleholder had paid taxes during the same ten year period. The intent of the legislature and the purpose of the statute is to give the recorded titleholder notice that someone is claiming an interest adverse to his. This notice may be in the form of a tax refund or a tax statement that the taxes are paid. Upon receiving this notice the recorded titleholder must take action to oust the adverse claimant within ten years or forfeit good title to the land described on the tax statement.
> . . .
> Where the payment of taxes will not serve as notice to the recorded title holder that someone is in possession of his land and claiming an interest adverse to his interest in the land, the statute requiring the payment of taxes is not a supplementary element of adverse possession.

Id. at 600, 601, 386 N.E.2d at 989. [8] The Kline court affirmed a determination of adverse possession for a strip of land 309 feet long and varying in width from one to four feet, where the adverse claimant believed his property extended to a boundary fence and assumed that he was paying taxes on the enclosed parcel. Rejecting the view of Judge Hoffman that Echterling "should be overruled and the plain and unambiguous meaning of the statute returned to it as was contemplated by the Legislature which adopted it," Id. at 603, 386 N.E.2d at 990 (Hoffman, J., dissenting), the court majority stated:

> The holding in Echterling . . . emphasizes the Indiana view of adverse possession and the practical need to cure defects in the recording of property descriptions and other defects of title. In circumstances where boundary disputes arise due to the erection of fences or other structures, the supplementary element of tax payments is inapplicable, since it does not serve as notice to the recorded titleholder that the identical described land on the tax statement is being adversely claimed by another. The erection of the fence or other structure becomes the notice to the adjoining titleholder.

---

[8] In support, the court cited Neu, 16 Notre Dame Lawyer at 216 ("The reason for this new requirement is also apparent, the further protection of the legal title holder and the greater notice afforded to him.")

Kline, 386 N.E.2d at 990.

On this issue, Kline was followed or quoted with approval in Williams v. Rogier, 611 N.E.2d 189, 193 (Ind. Ct. App. 1993) (stating that payment of taxes is not necessary where erection of fence or other structure provides sufficient notice to adjoining titleholder); Connors v. Augustine, 407 N.E.2d 1186, 1189 (Ind. Ct. App. 1980); (finding adverse possession of 16-acre tract openly farmed by claimant for requisite period, thereby providing notice to titled owner, and thus payment of taxes by claimant not required); Ford v. Eckert, 406 N.E.2d 1209, 1211 (Ind. Ct. App. 1980); (finding for adverse claimant who exerted possession on boundary strip he believed was his and who paid taxes as billed); and Berrey v. Jean, 401 N.E.2d 102, 105 (Ind. Ct. App. 1980) (citing Kline with approval but deciding case on other grounds).

In several of its decisions since Kline, the Indiana Court of Appeals thus appears to have favored a policy preference that avoided full application of the language of the adverse possession tax statute. Some opinions have expressly acknowledged this choice. *See, e.g.*, Berrey, 401 N.E.2d at 105 ("Cases construing [the adverse possession tax statute] have not demanded its rigid application in all situations."); Ford, 406 N.E.2d at 1211 ("[T]his rule of reasonableness in applying the tax provision is a sound one.").

Such disregard of clear statutory language, however, should be avoided, and we disapprove of Kline and its progeny as to their understanding and application of the adverse possession tax statute. This Court has emphasized that "courts must be careful to avoid substituting their judgment for those of the more politically responsive branches," Sanchez v. State, 749 N.E.2d 509, 516 (Ind. 2001), and that "[i]n our separation of powers democracy, the constitution empowers the legislative branch to make law." Baldwin v. Reagan, 715 N.E.2d 332, 337-38 (Ind. 1999). It is clear that "[t]he legislature has wide latitude in determining public policy, and we do not substitute our belief as to the wisdom of a particular statute for those of the legislature." State v. Rendleman, 603 N.E.2d 1333, 1334 (Ind. 1992).

As a co-equal and independent branch of government, the judiciary must be empowered to interpret and apply the law. Public trust and confidence in an independent judiciary, however,

is enhanced when judges exercise their authority with restraint and respect for the role and function of the legislative branch to decide questions of public policy.  The judiciary must respect the fact that the General Assembly is likewise a co-equal and independent branch.

In addition to these important principles of judicial restraint, however, it is well-established that a judicial interpretation of a statute, particularly by the Indiana Supreme Court, accompanied by substantial legislative inaction for a considerable time, may be understood to signify the General Assembly's acquiescence and agreement with the judicial interpretation.  In Durham v. U-Haul Int'l., 745 N.E.2d 755 (Ind. 2001), this Court observed that "if a line of decisions of this Court has given a statute the same construction and the legislature has not sought to change the relevant parts of the legislation, the usual reasons supporting adherence to precedent are reinforced by the strong probability that the courts have correctly interpreted the will of the legislature." *Id.* at 759.  *See also* Robbins v. Baxter, 799 N.E.2d 1057, 1062 (Ind. 2003) (applying legislative acquiescence where no legislative response for ten years); Halteman Swim Club v. Duguid, 757 N.E.2d 1017, 1021 (Ind. Ct. App. 2001), citing Department of Revenue v. U.S. Steel Corp., 425 N.E.2d 659, 662 (Ind. Ct. App. 1981) ("When the court interprets a statute and the legislature fails to take action to change that interpretation, the legislature is presumed to have acquiesced in the court's interpretation.").

Although our holding in Echterling has not been repeated in a series of cases from this Court, we have never repudiated it, and it has been applied for over fifty years in numerous Court of Appeals opinions, as discussed above.  During this time, the legislature has not responded by making any changes to the operative language of the 1927 statute as construed in Echterling fifty years ago.  That statute prohibited obtaining title by adverse possession "unless such adverse possessor or claimant shall have paid and discharged all taxes and special assessments of every nature falling due on such land or real estate during the period he claims to have possessed the same adversely."  Such language was retained verbatim until minor verb tense and gender amendments were made in 2002,[9] and even these changes do not manifest any legislative

---

[9] As amended in 2002, the language now reads "unless the adverse possessor or claimant pays and discharges all taxes and special assessments due on the land or real estate during the period the adverse possessor or claimant claims to have possessed the land or real estate adversely."  Ind. Code § 32-21-7-1 (P.L. 2-2002, Sec. 6).  Between its adoption in 1927 and the 2002 amendment, the statute was

18

disagreement with the way Echterling understood and applied the statute. This provides strong evidence of current legislative intent to abide by the Echterling interpretation.

Recognizing our obligation to follow and enforce the adverse possession tax statute as enacted by our legislature, we take a restrained view of the legislative acquiescence in Echterling's interpretation of the statute. We hold that Echterling permits substantial compliance to satisfy the requirement of the adverse possession tax statute in boundary disputes where the adverse claimant has a reasonable and good faith belief that that the claimant is paying the taxes during the period of adverse possession. But we decline to extend Echterling to permit total disregard of the statutory tax payment requirement merely on grounds that the legal title holder has other clear notice of adverse possession.

In the present case, as found by the trial court, the Mingers paid taxes on their land *adjoining* the disputed tract, but made no finding that the Mingers paid, intended to pay, or believed that they were paying, the taxes on the disputed tract. There is no finding that during the period of adverse possession the Mingers "paid and discharged all taxes and special assessments of every nature falling due on such land" as required by the adverse possession tax statute, nor is there a finding of substantial compliance. This is not a case of mistake due to imprecision in a tax duplicate or other assessment document. We therefore hold that, considering the issues of law and the facts found by the trial court and the inferences reasonably drawn therefrom, a reasonable trier of fact could not correctly conclude that compliance with the adverse possession tax statute was established, let alone by clear and convincing evidence.

### Conclusion

We reverse the judgment of the trial court and remand with instruction to enter judgment for the defendant appellant, Clarence E. Fraley.

---

amended once, in 1982, to change the word "Hereafter" to "After May 16, 1927," and the word "now" to "as of May 16, 1927." Acts 1982, P.L. 187, Sec. 24, p. 1375.

Shepard, C.J., and Boehm, JJ., concur.  Sullivan, J., concurs in result with separate opinion in which Rucker, J., concurs.

**Sullivan, Justice, concurring in result**.

Justice Dickson's discussion of adverse possession is extremely enlightening and a major contribution to Indiana property law. I agree with the Court's result that the Mingers are not entitled to the real estate in question because they have not shown compliance with Indiana Code Section 32-21-7-1. To reach this result, the Court utilizes the doctrine of legislative acquiescence to reconcile the clear conflict between the language of Indiana Code Section 32-21-7-1 and our decision in Echerling interpreting it. Instead, I would use this occasion to overrule Echerling altogether and hold that Section 32-21-7-1 must be enforced in accordance with its terms, i.e., to establish adverse possession, a person must have "pa[id] and discharge[d] all taxes and special assessments due on the land or real estate during the period the adverse possessor or claimant claims to have possessed the land or real estate adversely."

I would do so for two reasons. First, as the Court makes clear, Echerling simply does not comport to the mandate of the Legislature and our duty in this respect is to follow its intent. Second, I do not think the claim of legislative acquiescence to Echerling is quite as strong as the Court suggests. While it is true that the Legislature has not taken any steps that suggest disapproval with Echerling, it is equally true that this Court's (relatively few) adverse possession decisions over the intervening half-century have uniformly rejected claims of adverse possession such that the Legislature may well have concluded that Echerling was not precedent at all. I find only three cases presenting claims of adverse possession adjudicated by this Court since Echerling, and in each of these cases, we unanimously rejected the claim. See Beaver v. Vandall, 547 N.E.2d 802 (Ind. 1989); Estate of Mark v. H.H. Smith Co., 547 N.E.2d 796, 799 (Ind. 1989); McCarty v. Sheets, 423 N.E.2d 297, 300-01 (Ind. 1981).[10] Analogously, we rejected the claim of a party seeking to establish a prescriptive easement in the recent case of Carnahan v. Moriah Prop. Owners Ass'n, 716 N.E.2d 437 (Ind. 1999).

Rucker, J., concurs.

---

[10] But see Short v. Texaco, Inc., 273 Ind. 518, 406 N.E.2d 625 (1980) (upholding the constitutionality of the Mineral Lapse Act that terminated interests in coal, oil, gas, and other minerals not used for 20 years, noting "[t]he objectives are valid and similar to those served by acts of limitation and the law of adverse possession").