

FILED

Feb 28 2017, 5:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Jeffrey A. Boggess
Greencastle, Indiana

ATTORNEY FOR APPELLEE

Kent M. Frandsen
Parr Richey Obremskey Frandsen &
Patterson LLP
Lebanon, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Blaine Boyland, Amy L. Boyland, David K. Jones, and Susan E. Jones, *Appellants*, v. Castle Farms, Inc., *Appellee*. | February 28, 2017 Court of Appeals Case No. 06A05-1511-CC-1867 Appeal from the Boone Circuit Court The Honorable J. Jeffrey Edens, Judge Trial Court Cause No. 06C01-1401-CC-37 |

**Brown, Judge.**

Blaine and Amy L. Boyland and David and Susan Jones appeal the trial court's findings of fact, conclusions, and judgment in favor of Castle Farms, Inc., ("Castle Farms") regarding title to certain real property. They raise several issues which we consolidate and restate as whether the court's judgment is clearly erroneous. We affirm.

### Facts and Procedural History

Castle Farms owns real property north of and adjacent to real property owned by the Boylands and the Joneses in Boone County, Indiana, and the Boylands' property is located to the east of the Joneses' property. In 1959, a subdivision plat and dedication for a residential subdivision, The Woods, was recorded with the Boone County Recorder, and Lots 1, 2, and 3 were located along the northern border of the subdivision.[1] In 1960, a quitclaim deed conveyed to the owner of Lot 1 "[a] strip sixty-one (61) feet in width immediately adjacent to, alongside and north of Lot No. 1 in The Woods," and a quitclaim deed conveyed to the owner of Lot 2 "[a] strip sixty-one (61) feet in width immediately adjacent to, alongside and north of Lot No. 2 in The Woods." Defendant's Exhibits E, G.

In 1992, Castle Farms purchased certain farm property from Corner Grove Farms, Inc. ("Corner Grove"), and the purchased property included a field to

---

[1] The legal description for The Woods described the subdivision in part as beginning at a certain point, identified as "the Southwest corner of said Southeast Quarter of the Southeast Quarter of Section 19, Township 19 North, Range 1 East," and extending north "639.3 feet to a fence line." Plaintiff's Exhibit 5.

the north of The Woods subdivision. The field north of The Woods is separated from the residential lots by an old fence and tree line. At the time of the purchase, Castle Farms obtained an ALTA minimum standards detail survey from Anderson & Associates Land Surveyors depicting the property conveyed by Corner Grove to Castle Farms (the "1992 Survey").[2] The legal description of the property purchased by Castle Farms set forth on the 1992 Survey stated that the southern boundary was located, in part, "along an existing fence, . . . the North line of the Himmelein Property . . . and the North line of the Jones Property."[3] Plaintiff's Exhibit 20. Also, the 1992 Survey depicted Elizaville Road as located south of The Woods and indicated that the distance from a point on Elizaville Road[4] to the southern boundary of the property conveyed to Castle Farms as 700.3 feet. Dean Jackson farmed the field north of The Woods prior to its purchase by Castle Farms and continued to farm the field after 1992 pursuant to a sharecrop agreement with Castle Farms.

[4] In 1993, the Joneses acquired a residential lot which included part of Lot 1 and a strip sixty-one feet in width immediately adjacent to and north of Lot 1. In 2002, the Boylands acquired a residential lot which included part of Lot 2 and

---

[2] The 1992 Survey indicated that the Corner Grove property surveyed constituted 203.5620 acres and that the portion of the property containing the field north of The Woods, identified as "PT. E1/2, SE1/4, SEC 19, T19 N, R1E CENTER TWP, BOONE CO., IN," constituted 63.5943 acres. Plaintiff's Exhibit 20.

[3] At the time, Frederick and Abby Himmelein were the owners of part of the original Lot 2 in The Woods.

[4] This point is identified on the 1992 Survey as "SW COR, E 1/2, SE 1/4, SEC 19, T19 N, R1E." Plaintiff's Exhibit 20.

part of a strip sixty-one feet in width immediately north of and adjacent to the north line of Lot 2.

[5] Terry Castle, one of the principal owners of Castle Farms, first learned there was a question about the location of the boundary line when Blaine Boyland contacted a member of his family on November 26, 2007. Terry met with Blaine at the Boylands' property, looked at some drawings, and walked out on the field with Blaine. Terry indicated he did not wish to sell any land to the Boylands. At that time, Terry did not notice any dumping of logs or other items across the fence row, observed that the fence or fence remnants existed, felt comfortable with his ownership and did not see anything that was in question, and had not noticed the Boylands trying to occupy any of his property. On December 7, 2007, the Boylands re-recorded the warranty deed they received in 2002 but attached a modified legal description which indicated: "Also 61 feet in width immediately North and lying adjacent to the North line of the above described real estate."[5] Plaintiff's Exhibit 9.

[6] In 2013, Jackson informed Terry Castle he was unable to farm the property, and Terry visited the field and noticed that logs, cut wood, ash, and leaves had

---

[5] The legal description attached to the 2002 deed conveying the property to the Boylands included "a part of a strip 61 feet in width immediately North of and lying adjacent to the North line of said Lot Numbered 2." Plaintiff's Exhibit 8; Defendant's Exhibit O. The 2007 deed did not eliminate or modify this language. At trial, when asked if he re-recorded the deed in 2007 to correct what he thought was an ambiguity, Blaine Boyland testified "[w]e thought it was a clerical error" and indicated that he was not claiming an additional sixty-one feet, but that he owned a portion of Lot 2 in The Woods and a sixty-one-foot strip immediately north of The Woods. Transcript at 380. When later asked if he sent a copy of the deed he recorded in 2007 to Terry Castle or Dean Jackson, Blaine testified that he did not do anything with it. Terry Castle testified he learned of the 2007 deed in 2013.

been placed or dumped north of the fence line, that there was no fence in the area where the Boylands placed their drive, that the Boylands' driveway had been extended to the north from where it had been located in 2007 and where he thought the boundary between the properties was located, and that the logs and other debris extended north thirty or forty feet from where he thought the boundary existed. A letter was sent to the Boylands on behalf of Castle Farms in October 2013; the Boylands did not make any changes.

[7] On January 31, 2014, Castle Farms filed a complaint for trespass against the Boylands alleging it was the legal owner and in possession of certain real property,[6] that the Boylands had placed or caused to be placed upon a portion of its property large quantities of wood, tree stumps, lumber, and other materials, and that no action had been taken by the Boylands to remedy the trespass. The Boylands filed an answer and counterclaim, and the counterclaim alleged that they and their predecessors in title have possessed a tract of land "sixty-one (61) feet in width immediately North and lying adjacent to the North line of the real estate described in Paragraph 4"[7] and that they are the legal owners of the strip as a result of adverse possession. Appellant's Appendix at 74. Castle Farms filed a reply to the Boylands' counterclaim denying the Boylands had acquired any lawful interest in the sixty-one-foot-wide strip and

---

[6] The legal description set forth in the complaint is the one set forth on the 1992 Survey.

[7] In paragraph 5 of their counterclaim, the Boylands alleged they were the owners of certain real property and set forth a legal description which included the phrase "also a part of a strip 61 feet in width immediately North of and lying adjacent to the North line of said Lot Numbered 2." Appellant's Appendix at 74.

alleging that any attempt by the Boylands to acquire an interest in its land by virtue of the 2007 revision and re-recording of a deed fails as a matter of law. It alleged that the Boylands' purported attempt to add sixty-one feet to their property was undertaken without lawful consideration and without the consent, authority, or knowledge of Castle Farms.

[8]   On January 30, 2015, the Joneses filed a motion to intervene which stated that the dispute between Castle Farms and the Boylands involved "[a] strip sixty-one (61) feet in width immediately adjacent to, alongside and north of Lot No. 2 in The Woods," that "[t]he Joneses' chain of title includes an identical conveyance, with the sixty-one (61) feet lying immediately adjacent to, alongside, and north of Lot No. 1," and the court granted the motion to intervene. *Id.* at 80. The Joneses' complaint alleged counts of quiet title, trespass, and conversion and requested the court to decree that they are the fee simple owners of a strip sixty-one feet in width immediately adjacent to and north of Lot No. 1 in the Woods.

[9]   On March 2, 2015, the Boylands filed an amended answer and counterclaim alleging counts of quiet title, trespass, conversion, and adverse possession. They alleged that they are the owners of a sixty-one-foot-wide strip "lying

adjacent to the North line of the real estate described in Paragraph 4"[8] and requested a judgment that they are the fee simple owners of the strip. *Id.* at 100.

[10] On March 9, 2015, Castle Farms filed a reply to the Boylands' amended counterclaim which included affirmative defenses and alleged: "It is Castle Farms which has occupied and farmed the 61-foot strip of land in issue for more than the past 10 years and such occupation and use has been open and exclusive and adverse to any claim of the Boylands. Hence, Castle Farms has acquired ownership of that land by adverse possession, if it does not own it outright." *Id.* at 107. Castle Farms also filed an answer to the Joneses' complaint which stated: "If the 61-foot strip of land referenced in the Jones' complaint includes any land north of the fence row that has historically separated The Woods subdivision, as amended from the adjacent farm field, Castle Farms has occupied that land continuously and openly for more than 10 years and has acquired ownership thereof by adverse possession." *Id.* at 111.

[11] On April 6 and 9, 2015, the court held a bench trial at which the parties presented testimony and documentary evidence regarding title to the parcels, the tree and fence line, and Castle Farms' farming activities. The court admitted into evidence the property record cards for the tax parcel related to Castle Farms' field for a number of years between 2001 and 2014, and the cards

---

[8] In paragraph 5 of their amended counterclaim, the Boylands allege they were the owners of property with a legal description which included the phrase "also a part of a strip 61 feet in width immediately North of and lying adjacent to the North line of said Lot Numbered 2." Appellant's Appendix at 97.

showed a "Parcel Acreage" of 64.780 to 64.789 acres, "Total Acres Farmland" of 64.000 to 64.001, and "Measured Acreage" of 61.732 to 62.060. *See* Defendants' Exhibits BG-BQ. The court also admitted Castle Farms' tax statements from the Boone County Treasurer dated 2013 and 2014, both of which stated, under the parcel's description, the figure "64.78."[9] Plaintiff's Exhibit 14.

[12] Terry Castle testified that his company obtained the 1992 Survey when it purchased the land from Corner Grove, the survey included a reference to The Woods, and it showed that the southern boundary of Castle Farms' property was approximately seven hundred feet from Elizaville Road. He indicated that the property tax statement to be paid in 2013 points out a legal description of just under sixty-five acres and that, from what he could tell and as far as he knew, Castle Farms had been paying property taxes on the land it had purchased pursuant to the 1992 Survey. When asked "[h]as there ever been any adjustment in the . . . tax bills to reflect some confusion over a sixty-one (61) foot [sic] at least as far as your taxes were concerned," he answered "[n]othing that I've noted." Transcript at 162.

[13] Jonathon Hause, a professional land surveyor, testified that he found a marker at "the northwest corner of the sixty-one (61) feet that was added onto Lot 1" and that the distance from the middle of Elizaville Road to the marker was 700

---

[9] The legal description listed on the tax statement and the property record cards is: "PT E1/2 SE 19-19-1E." Plaintiff's Exhibit 14; Defendants' Exhibits BG-BQ.

feet. *Id.* at 57. When asked if any of "the other survey documents that you've seen reflect a second sixty-one (61) feet that was intended to go with the original or the amended Lot 2," Hause replied "[n]one up 'til the survey that was prepared for Mr. Boyland" by Richard Fidler. *Id.* at 65. Hause testified that the point 700 feet north from the road is where an old fence line existed and fence remnants still exist.

[14] Richard Fidler, a professional land surveyor, testified that he prepared a survey of their property for the Boylands. He testified that he would disregard the 639.3-foot dimension in the 1959 plat in favor of the fence because it was called for, and that he believed the sixty-one feet contained in the 1960 deeds is located north of the fence line. On his survey, Fidler depicted the northern boundary of the Boylands' property as sixty-one feet north of the dilapidated fence and listed a legal description for the surveyed property which included the additional language set forth in the deed recorded by the Boylands in 2007. The surveyor's report noted on the survey states in part: "There is an apparent overlap of 61' +/- along the north line of subject property." Defendant's Exhibit A. When asked, "you would assume, would you not that Castle Farms is [sic] the purchaser of that property could have reasonably expected that it was owning and acquiring from Corner Grove Farms everything north of that fencerow, correct," Fidler answered "I would assume that that's what they were expecting to buy." Transcript at 259. Fidler was asked about the overlap language in his survey and asked, "[s]o . . . you've got a situation here where under your scenario, you may have an overlap is [sic] a piece of land that's

owned by two different owners," Fidler replied "[m]aybe," and when asked "[a]nd that's why you say apparent," he answered "[r]ight." *Id.* at 260.

[15]     Terri Batts, a GIS technician with the Boone County Surveyor's Office, testified that the GIS department has the northern boundary of the Boylands' property located sixty-one feet north of the fence line. When asked how the Assessor determines acreage for purposes of taxing, Batts testified "[u]sually by my office," "when I do a split, a combination or subdivision or any kind of . . . work that I did in my office, I write a transfer slip," "I send the original sales disclosure and a copy of the transfer slip down to the reassessment office and that's how they determine the splits or any kind like that" and "that's how they determine to assess the property to actually go into the system and well I can't speak for them but I think they go into the system." *Id.* at 293-294. When asked "[a]nd your . . . GIS maps with the parcels laid over them, they create sort of acreage totals," she replied affirmatively. *Id.* at 294. When asked about overlapping deeds, she testified "[i]t is when like his deed would overlap a line to Boyland's deed but can I say I never saw that in anything I was drawing for them." *Id.* at 295. When asked if she attempted "to square up the number of acres that [Castle Farms] was paying taxes on and compare it to what [she] thought [it] should be paying taxes on," she replied "I sent notes down to the Assessor's Office but I don't do the taxes and I don't do the assessments. I just do the drawings and I did not have a current drawing for Castle." *Id.* at 301-302. She testified Castle Farms was not paying taxes on the sixty-one-foot strip as well and "[y]ou can't be taxed twice on the one parcel number." *Id.* at 303.

When asked "if Castle Farms['] parcel goes to the fencerow, then [it's] also paying taxes on that same sixty-one (61) feet, is [it] not," Batts replied "his parcel is not going to the, is not going past their parcel." *Id.* at 304.

[16] Lisa Garofollo testified that she is the elected County Assessor, the total deeded acreage of Castle Farms' parcel according to the property record cards was 64.78 acres, and the taxed portion of the parcel was less. She testified that the total acreage would include water, a pond, or a public road, the property owner does not pay tax on property it does not benefit from, and the cards do not indicate which approximately three acres were not assessed. When asked who makes the acreage determinations, she indicated it starts out with the legal description contained in the deed. When asked, "[w]hile the GIS mapping system may depict a line that represents where the GIS system shows the parcel line is located, that is not determinative of . . . the acreage for tax purposes," she indicated "it would go from the legal . . . contained in the deed." *Id.* at 343. When asked, "[i]f in fact the Boylands and the Jones . . . are paying taxes on this [acreage] north of the original Woods and if in fact that's included in the acreage that Castle Farms purchased from Corner Grove Farms, that could create an overlap for tax purposes, could it not," Garofollo testified "[s]ounds to me like it, yes." *Id.* at 347.

[17] The parties filed post-trial briefs addressing their respective interpretations of the legal descriptions and claims of adverse possession. In its post-trial brief, Castle Farms argued that, regardless of how the surveying issues are resolved, it owns the land north of the tree and fence row by virtue of adverse possession.

It stated the Boylands "have admittedly been taxed on the disputed 61' strip . . . [b]ut because [Castle Farms's] survey and resulting deed describe its land as extending to within 700' of the road . . . , it appears likely that [it] is also paying taxes on the 61' strip." *Id.* at 119-120. Castle Farms further argued it made an adequate showing that it paid the taxes it reasonably believed to be due on the land. In their post-trial brief, the Boylands and Joneses argued that they were the record owners of the sixty-one feet north of the historical fence, that Castle Farms failed to establish the elements of adverse possession with respect to the strip including that it paid taxes on the property, and that, even if the court determined Castle Farms is the record owner of the sixty-one feet north of the fence, the Boylands acquired thirty feet by adverse possession.

[18] On May 8, 2015, the court entered an order consisting of 207 findings and conclusions determining that Castle Farms is the owner of the disputed property by adverse possession. The court found that the Boylands and Joneses became the title owners of the strip as a result of the 1960 deeds and that Castle Farms, through Dean Jackson, had farmed the strip continuously since 1992 and satisfied each element of its claim for adverse possession continuously for at least ten years. With respect to taxes, the court found that the Boylands and Joneses have paid taxes on the sixty-one-foot strip; it is uncertain whether or not Castle Farms has also paid taxes on the strip; Castle Farms purchased property from Corner Grove in 1992; the 1992 Survey included the sixty-one-foot strip within the property that Castle Farms purchased from Corner Grove; and that "Castle Farms has paid all property taxes on the property it purchased

from Corner Grove . . . in 1992." *Id.* at 19. The court found, by clear and convincing evidence, that Castle Farms intended to pay the property tax on the strip and had a reasonable and good faith belief that it actually had paid them since 1992. It ordered that the Boylands remove all debris and property from the strip, other than septic lines, within ninety days and to remove all septic lines from the strip within two years.

[19] The Boylands and Joneses filed a motion to reconsider, their arguments including that even if Castle Farms had a good faith belief it paid taxes on the property, the court should amend its order to award Castle Farms only the portion of the sixty-one-foot strip that it actually farmed. They requested that the court "award only the land five (5) feet north of the Tree Line," as that is the only portion of the strip over which Castle Farms demonstrated it exercised palpable and continuing acts of ownership. *Id.* at 142. Castle Farms filed a response which argued that the fence row remnant is sufficiently definite to be used to establish the new boundary and that the tree line advanced by the Boylands is too irregular and insufficiently clear to serve as a new boundary.

[20] Following a hearing, the court entered an order on October 20, 2015 which noted that all parties deemed the motion to reconsider to be a motion to correct error. The court reviewed the evidence regarding the extent to which Castle Farms adversely possessed the strip of property, found that Castle Farms is the owner of that part of the strip extending north of an east-west line commencing seventeen and one-half feet to the north of the fence remnant, and ordered that

the parties hire a surveyor, the cost to be shared equally, to establish the legal description of the east-west boundary.

## *Discussion*

[21] The issue is whether the court's judgment is clearly erroneous. When a trial court enters findings of fact and conclusions thereon, findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. *Id.* First, it must determine whether the evidence supports the findings of fact, and second, whether those findings of fact support the trial court's conclusions. *Id.* Findings will only be set aside if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.* We review questions of law *de novo* and owe no deference to the trial court's legal conclusions. *M.K. Plastics Corp. v. Rossi*, 838 N.E.2d 1068, 1075 (Ind. Ct. App. 2005).

[22] To the extent the Boylands argue Castle Farms waived any claim of adverse possession, we note that in response to the Boylands' counterclaim Castle

Farms alleged: "It is Castle Farms which has occupied and farmed the 61-foot strip of land in issue for more than the past 10 years and such occupation and use has been open and exclusive and adverse to any claim of the Boylands. Hence, Castle Farms has acquired ownership of that land by adverse possession, if it does not own it outright."  Appellant's Appendix at 107. Further, in its answer to the Joneses' complaint, Castle Farms alleged: "If the 61-foot strip of land referenced in the Jones' complaint includes any land north of the fence row that has historically separated The Woods subdivision, as amended from the adjacent farm field, Castle Farms has occupied that land continuously and openly for more than 10 years and has acquired ownership thereof by adverse possession." *Id.* at 111.  The assertion that Castle Farms waived or failed to sufficiently plead its claim of adverse possession does not have merit.

[23] We next turn to the trial court's findings and conclusions regarding the parties' property interests.  In *Fraley v. Minger*, the Indiana Supreme Court rephrased the elements of adverse possession, holding that "the doctrine of adverse possession entitles a person without title to obtain ownership to a parcel of land upon clear and convincing proof of control, intent, notice, and duration." *Morgan v. White*, 56 N.E.3d 109, 115 (Ind. Ct. App. 2016) (citing *Fraley v. Minger*, 829 N.E.2d 476, 486 (Ind. 2005)).  These elements were defined in *Fraley* as follows:

> (1) Control—The claimant must exercise a degree of use and control over the parcel that is normal and customary considering the characteristics of the land (reflecting the former elements of "actual," and in some ways "exclusive," possession);

(2) Intent—The claimant must demonstrate intent to claim full ownership of the tract superior to the rights of all others, particularly the legal owner (reflecting the former elements of "claim of right," "exclusive," "hostile," and "adverse");

(3) Notice—The claimant's actions with respect to the land must be sufficient to give actual or constructive notice to the legal owner of the claimant's intent and exclusive control (reflecting the former "visible," "open," "notorious," and in some ways the "hostile," elements); and

(4) Duration—The claimant must satisfy each of these elements continuously for the required period of time (reflecting the former "continuous" element).

*Fraley*, 829 N.E.2d at 486; *Morgan*, 56 N.E.3d at 115. These elements must be satisfied for the statutory period of ten years and must be established by clear and convincing evidence. *Morgan*, 56 N.E.3d at 115-116 (citations omitted).

[24] In addition, Ind. Code § 32-21-7-1(a) provides that possession of real property is not adverse to the owner in a manner as to establish title to the property unless the adverse possessor pays all taxes and special assessments that it "reasonably believes in good faith to be due" on the property during the period the adverse possessor claims to have adversely possessed the real property. "Substantial compliance satisfies this statutory tax payment requirement 'where the adverse claimant has a reasonable and good faith belief that the claimant is paying the taxes during the period of adverse possession.'" *Celebration Worship Ctr., Inc. v. Tucker*, 35 N.E.3d 251, 254 (Ind. 2015) (quoting *Fraley*, 829 N.E.2d at 493).

[25] The record reveals that Castle Farms purchased farm property from Corner Grove in 1992 and, in connection with the purchase, obtained the 1992 Survey depicting the property. The 1992 Survey depicted the southern boundary of the property as located 700.3 feet north of Elizaville Road. Further, a fence line or fence remnants and a tree line was located along the identified boundary. In addition, the 1992 Survey indicated that the portion of the subject property containing the field north of The Woods constituted 63.5943 acres, and the property record cards for the parcel as well as the tax statements issued by the Boone County Treasurer reflect a total parcel acreage of approximately 64.78 acres. The total acreage attributed to the parcel for tax purposes was not less than the acreage set forth on the 1992 Survey, and based on the admitted property cards the total parcel acreage set forth on the 2001 property record card did not notably vary or decrease in subsequent years.

[26] Terry Castle indicated that, from what he could tell and as far as he knew, Castle Farms had been paying the property taxes on the land it had purchased from Corner Grove as described and depicted in the 1992 Survey, and he had not noticed any change in the tax statements which would suggest there was confusion regarding a sixty-one-foot strip of land as far as taxes were concerned. Further, land surveyor Hause testified that an old fence line existed and fence remnants still exist at the point 700 feet north from Elizaville Road, where the 1992 Survey identified the southern boundary of the property acquired by Castle Farms. Land surveyor Fidler, while indicating that the northern boundary of the Boylands' property is sixty-one feet north of the fence

line, also indicated that there is an apparent overlap of approximately sixty-one feet along the north line of the Boylands' property, that he would assume Castle Farms was expecting to purchase the property north of the fence row, and it is possible that there was a situation where an overlap of the tracts existed. Also, while Batts testified that Castle Farms was not paying taxes on the same tax parcel number as the Boylands, County Assessor Garofollo, when asked there could be "an overlap for tax purposes," testified "[s]ounds to me like it, yes." Transcript at 347. The trial court's findings that the 1992 Survey included the sixty-one-foot strip within the property that Castle Farms purchased from Corner Grove and that Castle Farms has paid all property taxes on the property it acquired from Corner Grove are supported by the evidence.

[27] Further, to the extent the Boylands assert the 1992 Survey was not recorded and thus unavailable to the county in determining which parties would be taxed and that Castle Farms should have investigated the county GIS mapping system, we note that County Assessor Garofollo testified that the acreage determination is based principally upon the legal description contained in the deed. To the extent the Boylands assert Castle Farms should have investigated the differences between the acreage figures on the property record cards or between the figures on the record cards and on the 1992 Survey, the total parcel acreage of approximately 64.78 acres for the tax parcel is not less than the acreage shown on the 1992 Survey of 63.5943 acres.

[28] Based upon the record, we cannot say that trial court's conclusion that Castle Farms had a reasonable and good faith belief that it had paid the property taxes

due on the property it had purchased from Corner Grove since 1992 is clearly erroneous, and our review of the evidence does not leave us with the firm conviction that a mistake has been made. *See Tucker*, 35 N.E.3d at 255 (observing the homeowners argued they and their predecessor paid all the taxes they reasonably believed in good faith to be due on the disputed real estate because they believed the disputed real estate to be part of the side yard of their lot, for which they actually paid taxes, and holding that "[t]his reasonable and good faith belief substantially complies with the statutory tax payment requirement"); *Morgan*, 56 N.E.3d at 115 (observing the parties treated the fence between their parcels as the boundary and affirming the trial court's determination that the Whites satisfied each of the elements of adverse possession, including the tax payment requirement, regarding property up to the fence line).

[29] To the extent Castle Farms asserts that the trial court's order should stand as to the Joneses because the notice of appeal was filed by the Boylands and was not filed jointly by the Boylands and the Joneses, we note that Ind. Appellate Rule 9(C) permits parties to file a joint notice of appeal,[10] that Appellate Rule 17(A) provides in part that a party of record in the trial court shall be a party on

---

[10] Ind. Appellate Rule 9(C) provides: "If two (2) or more persons are entitled to appeal from a single judgment or order, they may proceed jointly by conventionally filing a joint Notice of Appeal. The joined parties may, thereafter, proceed on appeal as a single appellant."

appeal,[11] and that Appellate Rule 9(A) provides in part that a party initiates an appeal by filing a notice of appeal and that, unless the notice of appeal is timely filed, the right to appeal shall be forfeited.[12] As we affirm the judgment in favor of Castle Farms for the reasons set forth above, we need not address Castle Farms' argument that the order should be affirmed as to the Joneses on the grounds they did not file a notice of appeal or joinder in the Boylands' appeal. *See Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 577 (Ind. 2013) (affirming the trial court's grant of summary judgment in favor of the appellee and not addressing whether a reversal would have applied to Holiday Hospitality alone given that it was the only party that appealed).

## *Conclusion*

[30] For the foregoing reasons, we affirm the judgment of the trial court.

[31] Affirmed.

Robb, J., and Mathias, J., concur.

---

[11] Ind. Appellate Rule 17 governs parties on appeal, and subsection (A) of the rule provides in part that "[a] party of record in the trial court . . . shall be a party on appeal."

[12] Ind. Appellate Rule 9(A) provides in part that "[a] party initiates an appeal by filing a Notice of Appeal with the Clerk (as defined in Rule 2(D)) within thirty (30) days after the entry of a Final Judgment is noted in the Chronological Case Summary," that "[h]owever, if any party files a timely motion to correct error, a Notice of Appeal must be conventionally filed within thirty (30) days after the court's ruling on such motion is noted in the Chronological Case Summary . . . ," and that, "[u]nless the Notice of Appeal is timely filed, the right to appeal shall be forfeited except as provided by P.C.R. 2."